```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
LORO DARAGJATI,                                             :
                                                            :
                              Plaintiff,                    :    **MEMORANDUM OPINION**
                                                            :
            - against -                                     :    14 Civ. 2727 (BMC)
                                                            :
CAROLYN W. COLVIN, Acting Commissioner                      :
of Social Security,                                         :
                                                            :
                              Defendant.                    :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

In this social security disability case, plaintiff claims he is disabled as a result of severe orthopedic impairments in his back, knees, neck and shoulders. He raises three points of error with respect to the decision of the Administrative Law Judge denying him disability benefits: (1) the ALJ failed to consider plaintiff's morbid obesity; (2) the ALJ improperly disregarded the report of plaintiff's treating physician that plaintiff was disabled; and (3) the opinion of job availability identified by the testifying vocational expert did not take into account plaintiff's impairments.

By short form Order, I have granted plaintiff's motion for judgment on the pleadings and denied the Commissioner's cross-motion. This Memorandum explains the basis for that decision.

## BACKGROUND

This case followed a somewhat unusual path to a determination, and one that did not help plaintiff in meeting his burden to prove disability. The timing was simply too attenuated and

there is limited evidence of medical treatment during the key period. Specifically, plaintiff filed his application for benefits on June 13, 2011. But he had stopped working and claims the onset of disability nearly 21 years earlier, on December 30, 1990. Based on his earnings record, he had acquired sufficient coverage to remain insured through December 31, 1995. This meant that he had to prove to the ALJ, in 2011, that he became disabled sometime between December 30, 1990 and December 31, 1995 (the "insured period").

The question naturally arose, and the ALJ raised it, why plaintiff had waited 16 years to apply for benefits. His explanation was that he had previously received social security disability benefits for left knee pain based on a service-related injury starting in 1977, but his disability benefits ended, which means he was found no longer disabled, in 1982. Then, in 1995, he received notice that he was a class member in Dixon v. Shalala, 54 F.3d 109 (2d Cir. 1995), which reopened over 200,000 previously denied disability claims. Before the ALJ, plaintiff claimed that he had received some paperwork in May, 1995 (perhaps the claim form); that he completed it, returned it, and, according to him, received an acknowledgment that the Social Security Administration was considering it, but the Administration never got back to him. After waiting to hear for 16 years, plaintiff filed his new application in 2011.[1]

Of course, this description did not really answer the question. If plaintiff was as disabled in 1995 as he was in 2011 (and in fact the record is pretty clear that – as of 2011 – he was), it is hard to imagine why he would simply wait for 16 years before making any inquiries. People may expect government agencies to move slowly, but when dealing with their own benefits, they don't typically expect them to move that slowly. The ALJ made some adverse findings about plaintiff's credibility, and while he did not expressly mention this peculiar timetable in the

---

[1] Plaintiff's attorney opines that plaintiff's submission of the 1995 paperwork means that "[i]t presumably remains an open request waiting for a response." That is a glass-half-full perspective if there ever was one.

2

context of credibility, he did repeatedly press the question to plaintiff and could not get a satisfying answer.

But the timeline gave plaintiff a bigger problem than credibility. He had very few medical records for the insured period. Plaintiff attributed this to house floods, doctors dying or retiring, and practices closing. But that is what can happen when you wait 16 years to make a claim. The result was that there were almost no medical records obtained that pertained to the insured period.

The only medical records of any probative value that the ALJ could find from the insured period were created right before the end of it, from September to November, 1995. Principal among these were an x-ray report which showed a narrowing of the medial joint compartment, osteoarthritic changes of the left knee, and a small suprapatellar spur. Plaintiff also had two MRIs in October, 1995, which showed left knee abnormalities – meniscus tears, bowing of the ACL, some osteoarthritis, and cartilage inflammation. He also had an outpatient surgical procedure on his knee in November, 1995 (we have only the billing documents, not any surgical records). The records from the insured period showed a moderately impaired knee, and no more.

After 1995, plaintiff had very little medical care or diagnosis until right before he filed the disability application at issue here in 2011. For the six years after the end of the insured period, there are no diagnostic records that could support a finding of disability. He apparently did have a CT scan in 2001, some injections into his knee in 2002, and some x-rays in 2003, but we only have the bills, and don't know what was behind those procedures. No other medical examinations were considered or performed until some months before plaintiff filed his 2011 application for disability benefits.

To bridge the gap in his insured period medical records, plaintiff relied on old records predating that period by more than a decade, and new records post-dating that period by more than a decade. The ALJ found that this was not very probative evidence. As to the former, the ALJ found:

> The claimant attempts to link physical impairments established decades earlier in the 1970's to his physical difficulties in the present, despite the fact that the claimant was able to pursue substantial gainful activities as late as 1990. Such inconsistency and selectivity suggests that the claimant's symptoms are not as severe as he alleges.

As to the post-insured period, the ALJ drew the fairly logical conclusion that what x-rays and MRIs showed in late 2010 and 2011, as plaintiff was preparing his disability application, was not all that helpful to understanding his condition 16-21 years earlier.

In determining that plaintiff had sufficient residual functional capacity ("RFC") to do sedentary work with restrictions, as the ALJ did, the ALJ essentially had to choose between two competing physicians. First, plaintiff proffered Dr. Joseph Suarez as his treating physician. Dr. Suarez, now retired, was an orthopedist in a medical group called Healthcare Associates in Medicine ("HAM"), a multi-disciplinary practice. The record shows that plaintiff had visited HAM between 1977-1983, but in the more recent era, he was referred there for pain management in December of 2010. The pain management specialist for HAM, Dr. Germaine Rowe, had an MRI done on him in February, 2011, and then turned him over to Dr. Suarez, who first saw him on June 22, 2011.

In that initial meeting, Dr. Suarez found very severe impairments in both knees and back. He created a detailed history and treatment note. I do not think there is any question that Dr. Suarez' findings in that note would mean that plaintiff was disabled as of that date, but the issue was whether he was disabled as of December 31, 1995, nearly sixteen years earlier. There

4

wasn't much in the note as to that question; the only statement touching on it was: "A case can be made that his lumbosacral spine pain, according to history, started to develop after the left knee with so many problems and surgeries." Dr. Suarez went on to give an opinion of current disability – *i.e.*, as of the date of the examination: "He has a chronic problem. He cannot sit for long periods of time or stand. He cannot use the upper extremities. Because of the persistent pain from the cervical spine, he has a total disability and this is permanent. He will not improve."

Dr. Suarez continued to see plaintiff every two to four months after the initial session on June 22, 2011. His treatment notes after the initial session are less detailed, but consistent with his initial note, and all repeat the finding of total disability set forth above. One note that stands out is from April 4, 2012, both because it speaks to plaintiff's history with Dr. Suarez and because it tied the 2011 findings to 1995. It first stated:

> The patient comes into the office today. The patient continues with bilateral knee pain, left worse than right. Cervical spine and lumbosacral spine pain is persisting. He is now complaining of bilateral hip pain. He again brings in reports that we reviewed back from the 70s. Recently, we found a document where he was seen in our office on March 1, 1983. Our records unfortunately did not go back that far, but the patient had a document where he requested documents from us regarding his case and this was in 1983. So, he must have been followed in our office back in 1983.

The end of the note concluded that plaintiff "has a permanent and total disability and he is unable to perform any type of gainful employment. The patient was followed in our office in 1983 and was definitely disabled before 1995 since his symptomatology was present already in 1983."

The only other document from Dr. Suarez worth noting is a "Multiple Impairment Questionnaire" dated May 1, 2012. The Questionnaire lists the date of first treatment as "1983." The diagnosis is "bilateral o.a.," which I assume is osteoarthritis, and "Deg [degenerative] disc

disease with foraminal stenosis cervical and lumbar spine." He gave plaintiff a prognosis of "poor." I cannot read all of his answer to the question which asked him to identify the positive clinical findings that support his diagnosis (his handwriting is consistent with the handwriting reputation of his profession), but what I can read says "knees – deformed. Limited flexion pain [illegible]. Cervical and lumbar spine [illegible]."

The ALJ gave Dr. Suarez' opinion "no weight" because it only pertained to the 2011 period. The ALJ, instead, preferred the opinion of a medical expert, Dr. Thomas Scott, a board certified orthopedist, who testified (by telephone) at the hearing. He had reviewed plaintiff's records, such as they were, but had not examined plaintiff. The ALJ asked him, carefully limiting his questioning to the insured period, if plaintiff met the "listings" of impairments; Dr. Scott answered in the negative. He also testified that during that period, plaintiff was limited in his ability to repeatedly bend, lift, stoop, climb, or take long walks, but that he could do these things occasionally. In addition, Dr. Scott testified that during the insured period, plaintiff could walk for one hour; sit without limitation; lift ten pounds; and occasionally climb stairs and ramps. On cross-examination, Dr. Scott acknowledged that it was reasonable, based on the objective evidence, for plaintiff to have testified that when he would sit, he would have needed to elevate his legs.

As noted above, the ALJ, in his decision, relied in part on plaintiff's acknowledgment that he had worked from 1984 through 1990. Until 1989, his employer was a company called Motion Camera Supply, and his title was Maintenance Manager. According to plaintiff's description, it was a mostly supervisory, sedentary job. His responsibility was to monitor a five-floor building undergoing repairs, take work estimates and job bids, and supervise a crew of seven people to do the repair work. He testified that the owners of the company made

6

accommodations for him because of his impairment, like allowing him to recline and elevate his legs, but that he could not stay in that reclined position too long because he had to move around. Then, in 1990, he left Motion Camera Supply and got a construction job, where he worked for nine months, but found it too physically demanding. In addition, the ALJ cited plaintiff's acknowledgment that he was still able to drive, attend church services, and engage in personal activities.

Finally, the ALJ obtained testimony from a vocational expert, Ms. Karen Simone. She first testified that plaintiff's RFC was not sufficient to allow him to perform his past relevant work. She then testified, in response to several hypotheticals presented by the ALJ based on plaintiff's actual condition, that an individual of plaintiff's age (at the time), education, experience, and RFC would be able to perform the requirements of several sedentary jobs such as order clerk, charge account clerk, and printer circuit board taper. Critically, she noted that these jobs all were classified by the Department of Labor's Dictionary of Occupational Titles ("DOT") as requiring an exertion level of "sedentary." She did not testify that any of the jobs she mentioned, in particular, required less than that exertion level. The ALJ found, based on this testimony, that plaintiff "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy."

## DISCUSSION

Familiarity with the five-step framework for analyzing disability claims is assumed. See generally 20 C.F.R. § 404.1520(a)-(c). Rather than set them out, I will instead proceed to consider each of plaintiff's alleged points of error.

**I. Failure to consider obesity**

Obesity is defined by an individual's Body Mass Index ("BMI"). It can be a severe impairment on its own or when combined with other impairments. SSR 02–1p. The ALJ is required to evaluate the impact of plaintiff's obesity as follows:

> The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. § 404 app. 1, 1.00Q. The regulations also require an ALJ to "consider any additional and cumulative effects of obesity" when determining a claimant's RFC regarding a cardiovascular impairment. Id. § 404 app. 1, 4.001(1).

Despite this mandatory directive, the ALJ's obligation "diminishes where evidence in the record indicates the claimant's treating or examining sources did not consider obesity as a significant factor in relation to claimant's ability to perform work related activities." Farnham v. Astrue, 832 F. Supp. 2d 243, 261 (W.D.N.Y. 2011) (citing Rockwood v. Astrue, 614 F. Supp. 2d 252, 276 (N.D.N.Y. 2009); Day v. Commissioner of Social Sec., No. 5-cv-1271, 2008 WL 2331401, *5 (N.D.N.Y. June 3, 2008)).

Assuming that plaintiff met the definition of obesity, the cited cases pretty much dispose of his claim that the ALJ had a duty to consider it. There is not a single reference in any medical record, let alone in a record in or close to the insured period, to plaintiff's obesity as either constituting a disabling impairment or contributing to any other impairment. There are scattered

references that could reasonably be construed as referring to obesity – in 2001, according to a letter that his wife wrote to the Social Security Administration, plaintiff had a gastric bypass, and plaintiff testified before the ALJ that his weight in late 1995 was 385 pounds. (We have no medical records to support either assertion.) There is also at least one note from late 1995 in which the former Veterans Administration described plaintiff as "obese." But there is no record of a doctor who ever listed obesity as a diagnosis or said anything like "this is making plaintiff's other problems worse."

The point of the cases cited above is that if the doctors do not identify obesity as a problem, then the ALJ does not have to consider it. This is only logical; if the ALJ concluded that the addition of obesity created a disabling combination of impairments, he would be making that up. There could be no basis for him to reach such a conclusion if no doctor has so opined, or at least suggested that obesity was an aggravating factor.

What plaintiff was asking the ALJ to do was make a diagnosis that no doctor had made and then determine that, either alone or in combination with his other impairments, it rendered him disabled when no doctor had expressed that opinion. Especially considering that the record shows substantial weight fluctuations over the protracted time period, at least one of which would make plaintiff non-obese, that was asking the ALJ to act outside of his role.

**II. Disregard of treating physician's opinion**

In weighing the medical opinion evidence, the ALJ is obligated to adhere to the rules set forth in 20 C.F.R. § 416.1527(c) (2012). These rules indicate that, generally, more weight is given to the following: (1) opinions provided by physicians who have actually examined a claimant; (2) opinions provided by a claimant's treating physicians; (3) opinions supported by objective relevant evidence; (4) opinions that are more consistent with the record evidence as a

whole; (5) opinions of specialists about medical impairments related to their area of expertise; and (6) opinions that may be supported by any other factors the claimant brings to the Commissioner's attention. Id. The second factor requires that the Commissioner must give a treating physician's opinion "controlling weight" if his or her opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." Id. at § 416.1527(c)(2). This is known as the "treating physician rule." See Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008).

I cannot fault the ALJ for giving no weight to Dr. Suarez' opinion. First, although Dr. Suarez "treated" plaintiff, he did not do so during the insured period and his opinion is therefore not entitled to the controlling weight that it would if he had. See Arnone v. Bowen, 882 F.2d 34, 41 (2d Cir. 1989). Plaintiff contends that in the Questionnaire, Dr. Suarez affirmed that he had treated plaintiff starting in 1983, but that is a more than a small mischaracterization. Dr. Suarez' other notes make it clear that he met plaintiff for the first time on June 22, 2011. When Dr. Suarez listed 1983 on the Questionnaire, he was clearly referring to plaintiff's having seen other health care providers at the multi-disciplinary HAM practice in the early 1980s – we don't know who they were, or even that they were orthopedists – not that Dr. Suarez had known or treated plaintiff since that time.[2]

Of course, Dr. Suarez had started treating plaintiff by the time of the hearing. And, as plaintiff correctly points out, there is nothing wrong with a treating physician giving a retrospective opinion. See, e.g., Rivera v. Sullivan, 923 F.2d 964, 968 (2d Cir. 1991). But when a doctor treats a patient for a year, and then gives a retrospective opinion for a time period 16-21

---

[2] Dr. Suarez testified that "[o]ur records unfortunately did not go back that far, but the patient had a document where he requested documents from us regarding his case and this was in 1983. So, he must have been followed in our office back in 1983." The manner in which Dr. Suarez reached this conclusion shows that he had no personal knowledge of plaintiff before June 22, 2011.

10

years prior with no continuity with the patient during the interim, that is not what the treating physician rule has in mind.

The reason deference is given to a treating physician is that he has worked with the patient through, or at least near to, the period of alleged disability, and thus has a better knowledge of the patient's impairments than someone who comes upon the patient cold. See Arnone, 882 F.2d at 41. Here, Dr. Suarez came upon the patient in 2011 as cold as would any medical consultant or medical expert. He examined the patient, read the file (such as it was), and then came up with a diagnosis. Indeed, given the 16-21 year gap and the dearth of records during the insured period, one could almost assert that Dr. Suarez's retrospective opinion was more akin to that of a pathologist than a treating physician. I therefore do not believe the ALJ had to apply the treating physician rule with the same vigor that it usually commands.

In fact, although plaintiff stresses the ability of Dr. Suarez, as treating physician, to offer a retrospective opinion, there is very little about his notes and reports that qualifies as retrospective, and what there is shows how speculative the exercise was in which he engaged. Almost everything Dr. Suarez noted described plaintiff's then-current (*i.e.*, 2011-2012) condition, including his repeated refrain that plaintiff is "totally disabled." The only retrospection Dr. Suarez offers is this: "The patient was followed in our office in 1983 and was definitely disabled before 1995 since his symptomatology was present already in 1983." By its reliance on symptomatology from 1983, the reasoning is exposed as fallacious, because it ignores that fact that plaintiff did fairly substantial work – including nine months of construction work – in the six years prior to the alleged onset date in 1990, despite being "followed in our office in 1983." So how would Dr. Suarez know that plaintiff became disabled between 1990

11

and 1995, as opposed to, for example, 1996? Or 1997? Or 1998 – still a dozen years before he met plaintiff?

The answer that leaps out is that Dr. Suarez undoubtedly knew that plaintiff had a disability benefits case pending and knew that plaintiff had to prove a disability before the end of 1995, for it seems most unlikely that Dr. Suarez' selection of an unspecified date "before 1995" was an orthopedic coincidence. This conclusion is buttressed by the fact that plaintiff first saw Dr. Suarez nine days after he filed his disability benefits application. It is further buttressed by the initial observation, the first day that Dr. Suarez met plaintiff, that "[a] case can be made that his lumbosacral spine pain, according to history, started to develop after the left knee with so many problems and surgeries." It is hard to avoid the conclusion about what "case" Dr. Suarez was talking about "making."

The only potentially viable aspect of plaintiff's argument is that the ALJ never referred specifically to the retrospective opinion quoted above, relying instead on the fact that the opinions in the Questionnaire appeared entirely current. That is true, and the ALJ probably should have referred to the April 4 treatment note. But the reasoning of the retrospective opinion here was so obviously flawed, for the reasons set forth above, that I cannot see how it would have made any difference in the ALJ's determination that the treating physician rule did not compel determinative deference.

If there was any infirmity to the ALJ's rejection of Dr. Suarez' opinion, it was that Dr. Scott's was not much better. At least Dr. Suarez had examined plaintiff. Moreover, Dr. Scott's opinion was entirely conclusory; he did not offer, and the ALJ did not inquire, how he reached his conclusions as to plaintiff's RFC, or what he based them on. But with Dr. Suarez' examination occurring some 16 years after the end of the insured period, and the near total

absence of records for that period, both physicians had to engage in an unusual degree of speculation. The ALJ's decision is sustainable based on substantial evidence in comparative terms – and therefore should be affirmed in this respect – because there was so little evidence at all. The poor quality of the evidence is chargeable to plaintiff, not necessarily because he waited so long to pursue his claim, but more importantly, because he had the burden of proof. See Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984).

### III. Plaintiff's ability to do sedentary work – with limitations

Plaintiff attacks the ALJ's finding that there were sufficient jobs in the national economy that plaintiff could have done during the insured period on the ground that the testifying vocational expert gerrymandered the requirements for those jobs to fit plaintiff's abilities. Specifically, plaintiff asserts that the DOT requires the ability to stand or walk for two hours for "sedentary" jobs, whereas Ms. Simone testified that plaintiff could do certain clerical, sedentary jobs even though, as Dr. Scott testified, the ALJ found, and Ms. Simone assumed, he can only stand or walk for one hour, not two hours. Plaintiff contends that under the Policy Interpretation for SSR 00-4p, the ALJ had an obligation to elicit an adequate basis from Ms. Simone as to why her view was inconsistent with the DOT before accepting her testimony.

It is true that the SSR 00-4p requires a reconciliation of differences between a vocational expert's testimony and the DOT. Specifically, SSR 00-4p, 2000 WL 1898704, *2 (2000), states:

> Occupational evidence provided by a [vocational expert] generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between [vocational expert] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert's] evidence to support a determination about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such a consistency.

13

> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

The DOT defines "Sedentary Work," in part, as follows: "Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." U.S. Dep't of Labor, Dictionary of Occupational Titles (4th ed. 1991). "Occasional" is defined as an "activity or condition [that] exists up to 1/3 of the time." Id. The Social Security Administration has adopted both of these definitions, and refined somewhat the definition of "occasional." As to the definition of "sedentary work," 20 C.F.R. § 404.1567 states that it has "the same meaning as [it has] in the Dictionary of Occupational Titles . . . ." As to the definition of "occasional," SSR 83-10 states: "Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."

As a technical matter, plaintiff's point is valid. When Ms. Simone opined, for example, in response to the ALJ's hypothetical that included a one-hour limit on standing or walking, that plaintiff could work as an order clerk, and that there were "19,580 jobs in the national economy; 767 in the State of New York; and 569 in the region," she was talking about jobs which, according to the DOT, might require as much as two hours standing during the day – something plaintiff could not do. The effect on her assessment was the same as if she had decreased the definition of "occasional" from 1/3 of the workday to 1/8 of the workday. And the ALJ did not ask her the basis for doing that.

14

The Commissioner's response to this argument is not persuasive. She first asserts that the ALJ solved this problem by phrasing his question in terms of "sedentary work *or a framework of sedentary work specifically*" including plaintiff's one-hour cap. But because of the way Ms. Simone answered that inquiry – strictly with sedentary jobs listed by the DOT as requiring as much as two hours – the Commissioner's argument does not explain how Ms. Simone got from Point A – jobs requiring as much as two hours of walking or standing – to Point B – jobs requiring only one hour of standing or walking.

The Commissioner next suggests, without using the term, that plaintiff waived this argument by not raising it before the ALJ, which would have given the ALJ an opportunity to close the gap in Ms. Simone's testimony, or cross-examining Ms. Simone himself. The Commissioner notes that plaintiff was represented by counsel, and that counsel did in fact cross-examine Ms. Simone, but not on this point. However, I am reluctant to find a waiver in the non-adversarial context of a disability benefits hearing. And the authority that the Commissioner cites, Brault v. Social Security Administration, Commissioner, 683 F.2d 443 (2d Cir. 2012), did not involve the mandatory duty of inquiry imposed by SSR 00-4p to reconcile contradictions between the DOT and a vocational expert's testimony because, in fact, the expert's testimony in Brault had more basis than simply the DOT. Brault, instead, discussed whether an ALJ has a general duty of inquiry of a vocational expert to uncover infirmities in the expert's opinion.

Finally, the Commissioner contends that, like the expert in Brault, Ms. Simone testified that she had personal knowledge of the particular occupations about which she thought plaintiff could perform, which was adequate to reconcile the discrepancy with the DOT. That overstates her testimony. On cross-examination, she was asked if employers of the one of the occupations she identified would let employees put their feet up on a stool. She said she had personal

experience with that issue to know that they would, and briefly explained why. That suggests that, if Ms. Simone had been asked the question, she would have been able to describe her experience sufficiently to opine that some or all of the positions she named only require one hour of standing or walking, not two, despite the DOT. But she was not asked the question, and the ALJ's failure to make the record did not comply with the mandate – "the adjudicator must elicit a reasonable explanation for the conflict" – contained in SSR 00-4p.

It does seem awfully inefficient to remand the case on this basis. For one thing, we are hardly dealing with precise numbers. When Dr. Scott opined that plaintiff could only stand or walk one hour a day, it was not as if he was saying that plaintiff has a battery that runs out at precisely 60 minutes every day at which point plaintiff has to stop walking or standing and sit down. Some days it may be 45 minutes; others it may 90 minutes; indeed, it may 90 minutes every day. That would be quite close to the "about two hours" contemplated by SSR 83-10.

Moreover, the tolerable standing/walking times in the DOT and the SSR rulings are themselves approximations. The DOT says "occasionally" means 1/3 of the workday, which for an eight hour workday, is 2.67 hours. SSR 83-10 reduces that to "generally" totaling "about 2 hours," which is actually itself inconsistent with the DOT, as it reduces the 1/3 of the workday in the DOT definition to 1/4. Ms. Simone's testimony, based on the hypothetical, reduced it further to 1/8 of the workday, but to a layperson, a "sedentary" job that requires standing or walking two hours out of eight hours might not seem all that sedentary, and Ms. Simone's testimony may be a better approximation of the average amount of standing for the DOT positions in the real world.

Add to this, as suggested above, that Ms. Simone has personal knowledge of the positions about which she was testifying, and it is hard to avoid the conclusion that she would testify on remand that there are a significant number of the jobs classified as "sedentary" in the DOT which

16

in fact require only one hour of standing/walking, and that she could set forth an acceptable basis for reaching that conclusion.

Nevertheless, I am compelled to remand the case for further testimony from a vocational expert. SSR 00-4p is written in mandatory language, and the majority of decisions in this Circuit apply it according to the way it is written. See, e.g., Patti v. Colvin, No. 13-cv-1123, 2015 WL 114046, *5-6 (W.D.N.Y. Jan. 7, 2015), citing Diaz v. Astrue, No. 11-cv-317, 2012 WL 3854958, at *6 (D. Conn. Sept.5, 2012) ("SSR 00–4p requires the ALJ to afford no room for conjecture where there is an apparent conflict between the VE's testimony and the DOT and a resolution by this Court would be unduly conjectural in the absence of clarification from the ALJ"); Molina v. Colvin, No. 13-cv-6532, 2014 WL 4955368, *9 (W.D.N.Y. Oct. 2, 2014); Gallegos v. Colvin, No. 13-cv-393, 2014 WL 4635418, *3-5 (D. Conn. Sept. 11, 2014); Pettaway v. Colvin, No. 12-cv-2914, 2014 WL 2526617, *12-13 (E.D.N.Y. June 4, 2014); King v. Commissioner of Social Security, No. 12-cv-277, 2013 WL 3967928, *4-7 (D. Vt. July 31, 2013); but see Wellington v. Astrue, No. 12-cv-3523 (S.D.N.Y. May 9, 2013) (failure to explain absence of sit/stand option in DOT as compared to VE's opinion was harmless error).

If I were to affirm this case, it would have to be because of my own sense that the missing testimony from the vocational expert would definitely be supplied on remand and therefore the error was harmless. I may think the missing testimony is likely, but that is not an adequate basis to affirm on a factual issue on which the Commissioner, unlike the other issues, has the burden of proof. See Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003). It may seem to me as a matter of common sense that a significant number of the occupations identified at the last hearing require only one hour of standing/walking, but the record gives me

no ability to make a factual determination of that and, more fundamentally, it is not my determination to make.

## CONCLUSION

The Clerk is directed to enter judgment remanding the case for a further hearing before the ALJ solely to expand the record to comply with SSR 00-4p, if it can be reconciled, and for the ALJ to make findings based on that hearing.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
January 31, 2015